UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

HALABU HOLDINGS, LLC,

                Plaintiff,                          Case No. 20-10427

vs.                                                 HON. MARK A. GOLDSMITH

OLD NATIONAL BANCORP,

                Defendant.
_____/

## OPINION & ORDER
## DENYING PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER AND FOR PRELIMINARY INJUNCTION (Dkt. 16), AND DENYING DEFENDANT'S MOTION TO DISMISS (Dkt. 10)

Plaintiff Halabu Holdings, LLC ("Halabu Holdings") has filed a motion for a temporary restraining order and preliminary injunction to prevent the sale of Defendant Old National Bank's ("Old National") branch office located at 1440 West Maumee St., Adrian, Michigan ("Property"), until this Court renders a judgment on the merits of the claim (Dkt. 16).[1] Old National has filed a motion to dismiss the suit (Dkt. 10). Briefing of both motions is complete, including supplemental briefs following a limited period of discovery.[2] For the reasons discussed below, both motions are denied, and the injunction enjoining Old National from selling, mortgaging, or otherwise encumbering or alienating the Property is lifted.

_____

[1] At various places, the address is listed as 1400 West Maumee Street, see, e.g., First Amended Complaint ¶ 1 (Dkt. 5), Mot. to Dismiss at 4 (Dkt. 10). The Court assumes these refer to the same Property, and this Opinion and Order applies regardless of the accurate address.

[2] Briefs concerning the motion to dismiss will be cited as "MTD," "MTD Resp.," and "MTD Reply." Briefs concerning the motion for temporary restraining order will be cited as "TRO/PI Mot.," "TRO/PI Resp.," and TRO/PI Reply."

In this diversity action, Halabu Holdings claims that Old National breached a contract to sell the Property to Halabu Holdings.  Both of the pending motions concern Old National's defense that any contract formed is void under the Michigan statute of frauds, which requires contracts for the sale of land to be supported by a signed writing.  Although a formal purchase agreement was never signed, Halabu Holdings argues that an email sent by Old National vice president and corporate facilities director Cory Mills satisfied the statute of frauds.  Halabu Holdings' pleadings in that regard are sufficient to defeat Old National's motion to dismiss.  In contrast to the complaint's allegations, the record developed through the limited discovery allowed shows that Halabu Holdings will not likely establish that the email in question satisfied the statute of frauds. Because Halabu Holdings has failed to show a substantial likelihood of success on the merits of its claim, its motion for temporary or preliminary relief is denied.

 Since an initial hearing conducted by District Judge Victoria Roberts and a further hearing before this Court, Old National has been enjoined from selling, mortgaging, or otherwise encumbering or alienating the Property.  See 3/17/2020 Stipulated Order Setting Deadlines (Dkt. 17); 3/26/2020 Order Following March 26, 2020 Hearing (Dkt. 23).  That injunction is now lifted.

## I.    BACKGROUND

Halabu Holdings owns a building in Adrian, Michigan, that is insufficient for the needs of its tenant, American Title Agency of Lenawee, Inc.  First Amended Complaint ("FAC") ¶¶ 14-15.[3]  Halabu Holdings and American Title Agency are both owned by Shamil Halabu ("Halabu") and his partners.  FAC ¶ 14.

---

[3] In its motion to dismiss and in response to Halabu Holdings' motion for a temporary restraining order and preliminary injunction, Old National accepts Halabu Holdings' version of the facts for purposes of these motions only.  MTD at 4 n.3; TRO/PI Resp. at 2 n.3 (Dkt. 19).  Facts are, therefore, drawn primarily from the amended complaint, except where Old National has specifically refuted Halabu Holdings' allegations, or where more specific facts are available from

In the final week of January 2020, Halabu Holdings' realtor, Steve Sack, learned that Old National would be closing its Adrian, Michigan, branch and selling the Property.  Id. ¶ 16.  Halabu and Sack toured the Property on January 31, 2020, with Old National's building manager, Dawn Kangas.  Id. ¶¶ 19-21.  They then engaged in negotiations over the phone with Old National vice president and corporate facilities director Cory Mills.  Id. ¶¶ 17, 23-31.  The content and results of those negotiations are disputed in some respects.

According to Halabu Holdings, the parties reached an oral agreement on January 31, 2020, when Halabu accepted Mills's offer to sell the Property for $295,000.  FAC ¶ 29.  Later that day, "Halabu sent Mills an email with the terms they had agreed to that afternoon."  FAC ¶¶ 32; see also 1/31/2020 email, Ex. 2 to FAC (Dkt. 5-1).  Halabu Holdings has referred to this email as the "Agreement Email."  FAC ¶ 32.  In an affidavit, Halabu stated that he reached an agreement with Mills, and that Mills asked Halabu to send him "an email containing the terms we agreed on." Halabu Aff., Ex. 1 to TRO/PI Mot. at ¶¶ 11-13 (Dkt. 16-1).  Halabu also stated that the email was "a complete and exact memorandum of all the terms we had agreed on over the phone."  Id. ¶ 13.

Supporting Halabu's version of events, Sack testified in a deposition that there was "a meeting of the minds" between Halabu and Mills concerning purchase price, personal property included, terms of payment, down payment, and approximate closing date.  Sack Dep., Ex. A to Suppl. Br., at PageID.447 (Dkt. 31-1).[4]  In Sack's view, the contract was complete, except that it needed to be reduced to writing.  Id.

---

the limited discovery taken.  Although this section provides the necessary background for evaluating both motions under consideration, the motion to dismiss is resolved entirely on the pleadings, and it need not be converted to a motion for summary judgment.  See Fed. R. Civ. P. 12(d).

[4] The parties have submitted different portions of Sack's deposition at docket entries 31-1 and 32-3.  The Court will refer to portions of each and identify the PageID number.

The text of the 1/31/2020 email itself frames the email as a "recap" of the parties' agreement.  See 1/31/2020 email.  In the email, Halabu recited nine terms of the purported agreement: price, broker's commission, deposit, title company, personal property included, closing date, delivery date, assessment appeal, and purchaser.  Id.  He asked Mills if he had missed anything and concluded by writing, "What about tax proration and rent from date of closing until deliver? [sic]."  Id.  Halabu's email was sent to Mills; he also copied his adult children, Peter Halabu and Elizabeth Halabu Casselman, id., who have been described as his business partners, see Sack Dep. at PageID.576-577.

Old National has neither confirmed nor squarely denied Halabu Holdings' allegations (i) that Mills and Halabu reached an oral agreement on January 31 or (ii) that Mills "asked Halabu to send him a follow-up email with the terms of their agreement."  FAC ¶¶ 29-30.  Old National's position on these matters is ambiguous.  On the one hand, Old National purports to accept for purposes of these motions that the parties reached an oral agreement on January 31, staking its defense entirely, at this juncture, on its position that the contract was void under the statute of frauds.  MTD at 3, 4 n.3; TRO/PI Resp. at 2 n.3 (Dkt. 19).  On the other hand, Old National also claims that Mills asked Halabu to send him Halabu Holdings' "proposed offer" following the January 31 meeting—not a written summary of an oral agreement—implying that offer and acceptance did not occur on January 31.  See MTD at 4.[5]  And in its supplemental brief, Old National writes that as of the afternoon of February 4, 2020, neither party had approval to enter into the transaction, again implying that a deal had not yet been reached.  Def. Suppl. Br. at 9 (Dkt.

---

[5] Mills testified that he requested an email following the meeting, although he could not remember whether he requested it of Halabu or Sack.  See Mills Dep., Ex. B to Pl. Suppl. Br. at PageID.466 (Dkt. 31-1).

32).[6]  Finally, at his deposition, Mills described the following events, which explicitly contradict the notion that an oral agreement had been reached:

> [Shamil Halabu] told me he liked the property.  He thought it was well-suited for his business.  He asked what the asking price was.  I quoted him 340,000.
>
> He asked me what I believe the lowest the bank officers would be willing to consider.  And I told him that the officers would have to decide for themselves, but I would not be afraid of presenting an offer of 295-, if that offer included no brokerage fees and a five-year deed restriction against uses of a financial institution.
>
> And he reassured me he was interested in the property for his own business's use, not for financial.
>
> . . .
>
> I explained to him—he said, Okay, great. I'll take it at 295-.
>
> And I said Mr. Shamil—Mr. Halabu, I'm sorry that's not what we do.  What we do is you send us a list of terms that you would be willing to consider.
>
> And we, if interested, we create a purchase contract using as many of your terms as possible and complete with terms that we would require, and then we would send to you and either your broker and/or attorney for review and consideration.

Mills Dep., Ex. B to Pl. Suppl. Br., at PageID.463-464 (Dkt. 31-1).[7]

Despite the evidence adduced, Old National has chosen not to oppose the pending injunction motion on the theory that no oral agreement was reached.  Based on Halabu Holdings' allegations—and Old National's concession in its briefing to treat those allegations as true for

---

[6] According to Old National, Halabu still needed the approval of his two partners, Peter Halabu and Elizabeth Halabu Casselman.  Def. Suppl. Br. at 8-9 (citing Sack Dep. at PageID.576.).  Likewise, Old National claims that its assent to the contract was "pending outcome of senior leadership," as Mills explained the morning of February 4 in an email to Sack.  2/4/2020 10:04 a.m. email, Ex. 7 to FAC (Dkt. 5-1).  However, Old National has not presented a developed argument that it is entitled to dismissal of the case or denial of Halabu Holdings' motion for injunctive relief based on the issue of authority.  Therefore, the issue of authority plays no role in the decision of the pending motions, except as it bears on the statute of frauds analysis.  See McPherson v. Kelsey, 125 F.3d 989, 995 (6th Cir. 1997) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.") (internal citations and marks omitted).

[7] Portions of the Mill deposition were submitted at docket entries 31-1 and 32-2.  As with the Sack deposition, these will simply be identified by PageID number for the remainder of the opinion.

purposes of these motions—the Court proceeds from the assumption that the parties reached an oral agreement and that Mills requested that Halabu send him an email with the terms to which they had agreed.

Mills did not respond immediately to Halabu's 1/31/2020 email, sent late on that Friday afternoon. The following Monday, February 3, 2020, Halabu emailed Sack to arrange a tour of the Property for Halabu and his partners. 2/3/2020 emails, Ex. 3 to FAC., at PageID.72-74 (Dkt. 5-1). Sack forwarded this request to Kangas and Mills and requested a floorplan. Id. Kangas replied to arrange a tour on February 4, 2020, at 2:00 p.m., and she attached a floorplan. Id. This discussion appears to have taken place on a separate email thread from the 1/31/2020 email. Mills was included in the email thread arranging the February 4 tour, but the thread does not suggest that he sent any of the emails.

On Tuesday, February 4, Halabu sent Mills an email in which he provided his contact information and wrote, "Please let me know if you need anything else." 2/4/2020 9:17 a.m. email, Ex. 4 to FAC (Dkt. 5-1). That email contained the contents of the 1/31/2020 email below Halabu's main message, suggesting that Halabu was following up on his own message before having received a response. Id. The header indicates that Halabu sent the email to Mills alone.

Mills responded minutes later, stating, "Thank you my friend. I will continue to work on your behalf." 2/4/2020 9:21 a.m. email, Ex. 5 to FAC (Dkt. 5-1). Mills copied Sack on the email.

This brief email lies at the heart of the controversy in this case, so a few details bear mention. Halabu Holdings refers to the 2/4/2020 9:21 a.m. email as the written acceptance, and it argues that it is a signed writing satisfying the statute of frauds. TRO/PI Reply at 2 (Dkt. 21). As may be pertinent to that analysis, Mills has sworn that he did not type his name at the end of the email, Mills Decl., Ex. A to TRO/PI Resp., ¶ 7 (Dkt. 19-1)., and the email does not show a

personally typed name, see 2/4/2020 9:21 a.m. email.  An email signature block appears below this message, containing Mills's name, position, and contact information.  In a sworn declaration, Mills stated that this email signature block is automatically generated by his email program and is automatically appended to each and every email he transmits from that email program.  Mills Decl. ¶ 6.

Sack, who had been copied on 2/4/2020 9:21 a.m. email, responded by writing, "Thank you! Any idea when we will receive your purchase agreement? Thanks, Steve Sack."  2/4/2020 10:01 a.m. email, Ex. 6 to FAC (Dkt. 5-1).  He explained that he sent that email because he wanted to have a written history on file, and because he wanted to "beat the competition" to facilitate the sale of the Property.  Sack Dep. at PageID.574.  Mills replied, "Surely by the end of the week, pending outcome of senior leadership approval.  Thanks in advance for your patience."  2/4/2020 10:04 a.m. email, Ex. 7 to FAC (Dkt. 5-1).  This email appears to have been sent to Sack alone. Id.  Sack forwarded these emails to Peter Halabu at 3:52 p.m. nine days later, on February 13, 2020.  Id.  Sack testified that these emails did not cause any doubt in his mind that Old National would proceed to closing.  Sack Dep. at PageID.577.

Later in the morning on February 4, Halabu sent an email to Mills in which he stated, "Steve [Sack] asked me to share with you information about my current building that will be vacant if we move to your branch."  2/4/2020 10:30 a.m. email, Ex. C to MTD (Dkt. 10-3).[8]

---

[8] Halabu's 2/4/2020 10:30 a.m. appears to be a direct response to Mills's 2/4/2020 9:21 a.m. email, because it appears in the same email thread and has Mills's 9:21 a.m. email directly below it. Based on that fact—and the copy of Mills's 10:04 a.m. email attached to the complaint, addressed to Sack alone—it is unclear whether Halabu had seen the 10:01 a.m. and 10:04 a.m. emails before sending his 2/4/2020 10:30 a.m. email.  In its supplemental brief, Halabu Holdings referred the 10:01 and 10:04 a.m. emails as "between Sack and Mills."  Pl. Suppl. Br. at PageID.438 (Dkt. 31).

Halabu, his partners, and some American Title employees toured the Property the afternoon of February 4.  FAC ¶ 39; Sack Dep. at PageID.576.  Sack also said that during the tour, Halabu was trying to convince his partners that the Property represented a "nice opportunity" for the title company.  Sack Dep. at PageID.576

On or about February 5, Mills told Sack that the bank had received another offer. FAC  ¶ 42.[9]  After some discussion between Mills, Halabu, and Sack, id. ¶¶ 42-49, Halabu sent an email stating his position that the parties had reached an agreement when Halabu accepted Mills's offer and terms, inasmuch as the terms were "reduced to writing and acknowledged by [Mills] as representative of the bank."  2/6/2020 email, Ex. 9 to FAC (Dkt. 5-1).  Halabu also stated that he was ready to close on the agreement or sue.  Id.; FAC ¶ 50.  On February 7, Mills told Halabu that the bank leadership had turned the issue over to its legal department, and on February 11, Old National sent an email stating, "We hereby reject your offer."  FAC ¶¶ 51-54.  This lawsuit followed.

## II.     DISCUSSION

### A.  Motion For Temporary Restraining Order And Preliminary Injunction (Dkt. 16)

The complaint alleges a single count: breach of contract regarding the sale of the Property. Old National has raised the defense that any contract formed was void under the statute of frauds, focusing principally on the lack of a valid signature.  Halabu Holdings argues that the 2/4/2020

---

[9] Much of Halabu Holdings' discovery and supplemental brief focuses on Old National's internal deliberative process and its ultimate decision to "steer the sale" to the Lenawee Community Foundation.  See Pl. Suppl. Br. at 5-9.  Old National's motivations for favoring another buyer may ultimately be probative of its witnesses' credibility.  While the existence of such a motive is consistent with Halabu Holdings' allegation that Old National breached a contract, it is also consistent with Old National's argument that it merely walked away from negotiations that had yet yielded an enforceable contract.  The issue does not play any significant role in the Court's analysis of either motion.

9:21 email contained a valid electronic signature in the form of Mill's signature box.  However, a factfinder will likely conclude that the purported signature is invalid because it was not "signed" with the requisite intent, and because Old National did not manifest an intent to finally complete the transaction by electronic means.  Therefore, Halabu Holdings is very unlikely to prevail on the merits of its claim.  Based on that conclusion and analysis of the other factors to be considered in determining whether to grant preliminary relief,  Halabu Holdings' motion is denied.

### 1.   Standard of Review

To determine whether to grant a preliminary injunction or temporary restraining order, a district court must consider: (i) whether the movant has established a strong likelihood of success on the merits; (ii) whether the movant would suffer irreparable injury without the injunction; (iii) whether issuance of the injunction would cause substantial harm to others; and (iv) whether the public interest would be served by the issuance of the injunction.  See Baker v. Adams Cty./Ohio Valley Sch. Bd., 310 F.3d 927, 928 (6th Cir. 2002); Hamad v. Woodcrest Condo. Ass'n, 328 F.3d 224, 230 (6th Cir. 2003).  These four factors "are factors to be balanced, not prerequisites that must be met."  Hamad, 328 F.3d at 230.

"The strength of the likelihood of success on the merits that needs to be demonstrated is inversely proportional to the amount of irreparable harm that will be suffered if a stay does not issue."  Baker, 310 F.3d at 928.  A district court may exercise its discretion to grant a preliminary injunction "even where the plaintiff fails to show a strong or substantial probability of ultimate success on the merits of his claim, but where he at least shows serious questions going to the merits and irreparable harm which decidedly outweighs any potential harm to the defendant if an injunction is issued."  Friendship Materials, Inc. v. Michigan Brick, Inc., 679 F.2d 100, 105 (6th Cir. 1982).  However, as a general matter, the party seeking the extraordinary relief of a

preliminary injunction must do more than create a jury issue, as "the proof required for the plaintiff to obtain a preliminary injunction is much more stringent than the proof required to survive a summary judgment motion."  Leary v. Daeschner, 228 F.3d 729, 739 (6th Cir. 2000).

Although not precisely related to the standard of review, one legal rule bears mention upfront.  Michigan uses an objective test to determine whether there was mutual assent to a contract.  See Rood v. Gen. Dynamics Corp., 507 N.W.2d 591, 598 (Mich. 1993).  While there is much discussion of "intentions" throughout this opinion, parties' subjective intentions are inconsequential; what matters is how they manifest their intentions to one another.

### 2.  Analysis

Halabu Holdings has not shown a substantial likelihood of success on the merits or even "strong questions" on the merits, because a factfinder would likely determine that any contract formed would be void under the statute of frauds.  It also has not shown the remaining factors favor issuance of an injunction.

### a.  Likelihood of Success on the Merits

The dispute in this motion hinges entirely on Old National's statute of frauds defense.  Because the purported contract involved a sale of real estate, Michigan's statute of frauds required a written and signed memorialization of the contract.  See Mich. Comp. Laws § 566.108.  The statute of frauds, in relevant part, states the following:

> Every contract . . . for the sale of any lands, or any interest in lands, shall be void, unless the contract, or some note or memorandum thereof be in writing, and signed by the party by whom the . . . sale is to be made, or by some person thereunto by him lawfully authorized in writing.

Id.

According to Halabu Holdings, (i) the contract was formed orally on January 31; (ii) the 1/31/2020 email, together with the 2/4/2020 email, constituted a written note or memorandum of

10

the already-formed agreement, and (iii) the 2/4/2020 9:21 a.m. email contained the authorized signature, in the form of Mills's signature block.  FAC ¶¶ 56-60.  For the purpose of this motion, Old National admits that the parties reached on oral agreement on January 31, 2020.  TRO/PI Resp. at 3.  Assuming that an oral agreement occurred on that date, Halabu's recitation of the terms in the 1/31/2020 email could reasonably be construed as a written memorandum of the oral agreement.

This leaves the question of whether the 2/4/2020 9:21 a.m. email provided the authorized signature.  If it contained a signature that was valid under the law, the signature would render the combination of the 1/31/2020 email and the 2/4/2020 9:21 a.m. emeil a signed memorandum, thereby validating the oral contract.

Old National presents two arguments that the 2/4/2020 email did not provide an authorized signature.  First, Old National argues that it did not agree to use electronic means to bind itself to the contract, as required under the Michigan Uniform Electronic Transactions Act ("MUETA"), which allows electronic signatures to serve as binding legal signatures only between parties who agree to conduct business electronically.  See Mich. Comp. Laws § 450.835 et seq.

Second, Old National argues that "[e]ven if the parties had agreed to conduct the transaction by electronic means, neither the [TRO/PI] Motion nor the FAC sufficiently show that Mr. Mills intended to sign or actually signed [Mills's 2/4/2020 9:21 a.m. email]."  TRO/PI Resp. at 11-12.  The Court understands this argument to mean that the email did not manifest the intent required under the statute of frauds; that is, an intent that Old National was adopting the memorandum memorializing the parties' agreement.[10]

---

[10] Old National also appears to argue that the signature block is deficient because it was automatically generated rather than manually typed. Old National's argument is addressed—and rejected—in the discussion of the motion to dismiss.

The analysis of Old National's second argument will be addressed first, because it informs the analysis of Old National's first argument.  Well before the electronic age, Michigan allowed a wide variety of symbols to constitute a signature, if those symbols manifested an intent to adopt a contract or a memorandum thereof.  As the Sixth Circuit has noted, Michigan law has a "long history of the statute of frauds under which a 'signature' could include any notation signifying adoption or assent to being bound."  Pittmann v. Experian Information Solutions, Inc., 901 F.3d 619, 637 (6th Cir. 2018) (internal citations and quotations omitted).  Consistent with this view of the signature requirement, MUETA defines an "electronic signature" as "an electronic sound, symbol, or process attached to or logically associated with a record and executed or adopted by a person with the intent to sign the record."  Mich. Comp. Laws § 450.832(h).

Here, a factfinder would be exceedingly unlikely to find that the 2/4/2020 9:21 a.m. email manifested Old National's assent to the contract or adoption of the memorialization of the contract.  As a consequence, under the statute of frauds, the signature block will likely be found not to constitute a valid signature.

Because anything in our case that might constitute a signature is electronic in nature, the Court must initially look to the statute adopted by Michigan relative to electronic transactions.  MUETA is clear that "an electronic sound, symbol, or process attached to or logically associated with a record" is only an electronic signature if it is "executed or adopted by a person with the intent to sign the record."  Mich. Comp. Laws. § 450.832(h).  The official comments to the Uniform Electronic Transactions Act ("UETA") emphasize and clarify that the requisite intent is an "intent to do a legally significant act":

> The definition requires that the signer execute or adopt the sound, symbol, or process with the intent to sign the record.  The act of applying a sound, symbol or process to an electronic record could have differing meanings and effects.  The consequence of the act and the effect of the act as a signature are determined under

12

other applicable law.   However, <u>the essential attribute of a signature involves</u> <u>applying a sound, symbol or process with an intent to do a legally significant act.</u> <u>It is that intention that is understood in the law as a part of the word "sign", without</u> <u>the need for a definition.</u>

UETA Cmt. to Section 2 (emphasis added), https://perma.cc/UXY2-7V4R.

In the context of our case, the UETA comment's description of "an intent to do a legally significant act" and the Sixth Circuit's description of a "notation signifying adoption or assent to being bound" both point to the same required showing by Halabu Holdings: a showing that by composing and sending the 2/4/2020 9:21 a.m. email containing the signature box, Mills manifested Old National's assent to the contract, or its intent to adopt a memorandum consisting of the 1/31/2020 email and the 2/4/2020 9:21 a.m. email.   Without that, there could be no valid signature under the statute of frauds, and no intent to perform a legally significant act as required under MUETA.   A review of the record leads to the judicial prediction that it is unlikely that a factfinder will conclude that the 2/4/2020 9:21 a.m. email manifested the requisite intent.

First and foremost, the text of the email, read in context, does not indicate an intent to adopt the memorandum, assent to the contract, or otherwise perform a legally significant act.   Mills wrote, "Thank you my friend.   I will continue to work on your behalf."   2/4/2020 9:21 a.m. email. This statement does not say much of anything and could be read in any number of ways.   It is possible that he was responding only to Halabu's most recent email, in which Halabu gave Mills his contact information.   It is possible he still understood Halabu's terms of agreement as an offer rather than as a summation of an agreement, but having told Halabu once that the deal was not yet final, Mills Dep. at PageID.464, he did not bother making this point again.   Arguably, Mills should have communicated that in his view, a final contract had not yet been reached.   But by the same token, Halabu might have written "please confirm our oral transaction" instead of "Please let me know if you need anything else" in his 2/4/2020 9:17 a.m. email.   The communications were

ambiguous, and while a factfinder will ultimately need to determine how reasonable parties would interpret them, Halabu Holdings has not met its burden of showing a substantial likelihood it will succeed in advocating for its interpretation. It has not even raised a strong question in that regard.

Second, a factfinder applying common and business sense will likely conclude that sophisticated businesspeople do not conclude $295,000 real estate transactions without a purchase agreement. Sack, whom Halabu Holdings calls "independent," Pl. Suppl. Br. at 2-3 (Dkt. 31), gives voice to this view:

> I've always said that, well, unless it's in writing what do we really have. We have an agreement, but it's verbal, and that's what I always—I pushed Cory [Mills] for the purchase agreement . . .
>
> I've always been trained, you got to have a purchase agreement by broker. I know I want one for our company. I've always been told that the State of Michigan requires purchase agreements, so I guess that's why I pushed that.
>
> My understanding is [to have a legally binding purchase agreement for real estate in Michigan] you have to have a meeting of the minds, an agreement, consideration, both parties acting for their both best interests [sic] and in writing. . . .
>
> I felt there was a meeting of the minds but not an agreement in writing.

Sack Dep. at PageID.446-447.[11] Sack also testified that he has never used an email signature block to buy or sell real estate. Id. at PageID.574. Against this backdrop, a factfinder would likely interpret the 2/4/2020 9:21 a.m. email as a legally insignificant commitment to continue building momentum toward a binding contract, not an acknowledgement of an already binding contract.[12]

---

[11] Halabu Holdings repeatedly objected to questions that called for legal conclusions. Sack's testimony is taken only for how a sophisticated businessperson familiar with Michigan real estate transactions would interpret the parties' action, not for any legal conclusions he reached.

[12] Halabu Holdings attempts to marginalize the undisputed fact that the parties contemplated signing a purchase agreement by arguing that the contemplated purchase agreement was nothing more than a "ministerial formality," as Michigan law recognizes that parties may make an enforceable contract binding them to prepare and execute a subsequent agreement. MTD Resp. at 9; PI/TRO Reply at 4 n.11 (both citing, inter alia, Hansen v. Catsman, 123 N.W.2d 265 (Mich. 1963)). But Halabu Holdings does not attempt to argue that such an "agreement to agree" to sell land would itself be exempt from the statute of frauds. And the text of the 2/4/2020 9:21 a.m.

Third and finally, Halabu Holdings' side did not act like a party that had a valid contract after receiving the 9:21 a.m. email.  Soon after receiving Mills's email, Sack sent an email asking when Halabu Holdings would receive Old National's purchase agreement.  2/4/2020 10:01 a.m. email.  He testified to sending the email, in part, to "beat the competition." Sack Dep. at PageID.574.  Later that day, Halabu sent an email sharing information about his current building, which he said, "will be vacant if we move to your branch."  2/4/2020 10:30 a.m. email (emphasis added).[13]  On February 5, Halabu emailed Mills and wrote,  "Please update me a [sic] to the status of our offer."  2/5/2020 8:09 a.m. email, Ex. 6 to Def. Suppl. Br. (Dkt. 32-6) (emphasis added). Of course, what matters is how a reasonable party in Halabu Holdings' position would interpret the 2/4/2020 9:21 a.m. email, not how Halabu Holdings' members and agents actually interpreted it.  But how they responded and behaved is at least somewhat probative of how a reasonable party would interpret the email, and their behavior is consistent with substantial evidence suggesting that a deal had not yet been finalized and validated by a signature.

A factfinder would likely find that the 2/4/2020 9:21 a.m. email did not manifest an assent to the contract, or an intent to adopt a memorandum consisting of the 1/31/2020 email and the 2/4/2020 9:21 a.m. email.  As a consequence, the factfinder would also likely conclude that the signature box was not affixed to the email with the intent of performing a legally significant act. Therefore, the contract will likely fail under the statue of frauds.

---

email no more manifests an intent to sign a future agreement than it manifests an intent to be immediately bound or to adopt a memorandum of an already binding agreement.

[13] Halabu Holdings attempts to explain away Halabu's email by writing that it "is perhaps telling that the email language is 'if we move to your branch' not 'if we purchase your branch.'"  See MTD Resp. at 11 n.1  (Dkt. 20).  But this distinction—based on the possibility that Halabu Holdings might have wanted to purchase the building but not have American Title occupy it— appears to be inconsistent with Halabu Holdings' representation that "the Property is uniquely suited for American Title's operations and is the first appropriate property in Adrian that has become available for purchase in over two years of active searching."  TRO/PI Mot. at 12.

Returning to Old National's first argument, the Court now considers whether Old National agreed to conduct business electronically. MUETA allows electronic writings and signatures to serve as binding legal signatures. See Mich. Comp. Laws § 450.835 et seq. However, MUETA only applies "to transactions between parties each of which has agreed to conduct transactions by electronic means." Id. § 450.835; see also Audi AG v. D'Amato, 469 F.3d 534, 545 (6th Cir. 2006). Old National argues that Halabu Holdings failed to allege, much less prove, that the parties agreed to use electronic signatures to contract for the sale of the Property. TRO/PI Resp. at 9-11. It further argues that the parties' expectation of signing a formal purchase agreement means that they did not agree to bind themselves to the contract by email prior to drafting the purchase agreement. Id.

"Whether the parties agree to conduct a transaction by electronic means is determined from the context and surrounding circumstances, including the parties' conduct." Mich. Comp. Laws § 450.835. The same circumstances and conduct showing that Mills likely did not manifest an intent to perform a legally significant act when he sent an email containing his signature block—the text of the email, the anticipation of a formal purchase agreement, and Halabu Holdings acting like a party lacking a valid contract—support the conclusion that Mills did not manifest an intent to conduct an electronic transaction that would finally bind Old National to the contract.

Halabu Holdings offers two rejoinders: first, that Mills requested that Halabu send him a "recap" of the agreement; and second, that Mills's 2/4/2020 9:21 a.m. email did not deny that the 1/31/2020 email recapped the parties' oral agreement. See TRO/PI Reply at 3-4; Pl. Suppl. Br. at 4. Neither is persuasive.

By his own admission, Mills asked Halabu for a follow-up email, Mills Dep. at PageID.464, and although Mills testified that he only solicited terms Halabu Holdings was willing

to consider, id., Old National effectively conceded for purposes of this motion that he asked for a memorandum of terms to which the parties had agreed.  But even so, his interest in receiving a memorandum by email does not imply his intent to sign it by email; moreover, both the text of email and the expectation of signing a purchase agreement that would finally bind the parties belie such an intent.

Halabu Holdings' second rejoinder is essentially a non-sequitur. The failure to deny the substance of a communication does not imply anything about an agreement to conduct a transaction electronically.

In sum, the evidence shows little likelihood that Halabu Holdings will prevail on its contention that the parties agreed to conduct and conclude a transaction electronically, nor has it raised any strong question raised about this.[14]

---

[14] Although the Court finds that Old National will likely prevail on its contention that there was no agreement to transact business electronically, the Court does not adopt Old National's view that a single email communication cannot satisfy MUETA's requirement for such an agreement. See, e.g., UETA Cmt. to Section 5 ("If one orders books from an on-line vendor, such as Bookseller.com, the intention to conduct that transaction and to receive any correspondence related to the transaction electronically can be inferred from the conduct.").  Old National correctly observes that a robust, multi-step electronic signature process is more likely to evidence an intent to be bound by an electronic signature than informal emails.  Compare Audi, 469 F.3d at 545 (holding that press release sent in a mass email did not evidence an intent to contract); with Harpham v. Big Moose Inspections, Inc., No. 321970, 2015 WL 5945842, at *2-3 (Mich. Ct. App. Oct. 13, 2015) (holding that a six-step process in which the party to be charged had the opportunity to review the contract before clicking to "sign" it satisfied MUETA's requirements).  However, there is authority upholding the validity of contracts effectuated by electronic signatures where the electronic signature process was not particularly robust and consisted of no more than an email. See, e.g., Gillis v. Wells Fargo Bank, N.A., 875 F. Supp. 2d 728, 733 (E.D. Mich. 2012); Dow Chem Co. v. General Elec. Co., No. 04-10275, 2005 WL 1862418, at *25 (E.D. Mich. 2005); Reg'l Council of Carpenters v. New Century Bancorp., Inc., 99 F. App'x 15, 22 (6th Cir. 2004).

### b.  The Remaining Preliminary Injunction Factors

As Halabu Holdings observes, Old National did not address the other three factors in the preliminary injunction analysis.  TRO/PI Reply at 7.  But this does not mean that those factors weigh in Halabu Holdings' favor, nor does it mean that they compensate for an inadequate showing on the merits.

Concerning the balance of harms, Halabu Holdings argues that the Property is uniquely suited to its needs, that no other property has been available in Adrian, Michigan, in two years of active searching.  TRO/PI Mot. at 12.  Furthermore, Halabu Holdings argues that the building will likely be sold if Old National is not enjoined from doing so, rendering the harm irreparable.  Halabu Holdings also argues that it offered to pay Old National more money than Old National's preferred buyer, suggesting that Old National will benefit from the issuance of an injunction.  Id.  However, there is no reason to doubt that Old National made the business decision best serving its interests, or that both Old National and Lenawee Community Foundation would be harmed if the Court prevented their transaction. While the loss to Halabu Holdings may satisfy the standard for irreparable loss, the delay to others in acquiring property that they likely will be entitled to acquire is a third-party harm, which a court may take into account in considering the appropriate balance to strike on a motion for preliminary injunctive relief. See McGirr v. Rehme, 891 F.3d 603, 610, 614 (6th Cir. 2018).

Concerning the public interest, Halabu Holdings argues that public policy favors the enforcement of contract rights.  See Mot. at 13-14 (citing Wonderland Shopping Ctr. Venture L.P. v. Macomb Mall Associates L.P., 274 F.3d 1085, 1098 (6th Cir. 2001)).  But because Halabu Holdings has not shown that a substantial likelihood of success on its claim that it entered into a valid contract with Old National, the public interest does not favor Halabu Holdings.

In sum, Halabu Holdings has not shown a substantial likelihood of success on the merits; nor has it raised strong questions regarding the merits. Nor do the other factors favor issuance of an injunction. Its motion must be denied.

## B. Motion to Dismiss (Dkt. 10)

The parties raise many of the same arguments with respect to Old National's motion to dismiss as they do with respect to the motion for preliminary injunction. However, Halabu Holdings' arguments are more persuasive when considered under the standard of review for a motion to dismiss than under the standard of review applicable to a motion for a temporary restraining order and preliminary injunction. Halabu Holdings has sufficiently alleged that the contract is supported by a valid signature, and Old National is not entitled to dismissal based on its statute of frauds defense.

### 1. Standard of Review

On a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), "[t]he defendant has the burden of showing that the plaintiff has failed to state a claim for relief." Directv, Inc. v. Treesh, 487 F.3d 471, 476 (6th Cir. 2007) (citing Carver v. Bunch, 946 F.2d 451, 454-455 (6th Cir. 1991)). To survive a Rule 12(b)(6) motion, the plaintiff must allege sufficient facts to state a claim to relief above the speculative level, such that it is "plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). The plausibility standard requires courts to accept the alleged facts as true, even when their truth is doubtful, and to make all reasonable inferences in favor of the plaintiff. Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009); Twombly, 550 U.S. at 555-556.

Evaluating a complaint's plausibility is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." Iqbal, 556 U.S. at 679. Although a

complaint that offers no more than "labels and conclusions," a "formulaic recitation of the elements of a cause of action," or "naked assertion[s]" devoid of "further factual enhancement" will not suffice, id. at 678, it need not contain "detailed factual allegations," Twombly, 550 U.S. at 555; see also Erickson v. Pardus, 551 U.S. 89, 93 (2007) ("[S]pecific facts are not necessary . . . ."). Rather, a complaint needs only enough facts to reasonably suggest that discovery may reveal evidence supportive of a claim, even if the likelihood of finding such evidence is remote. Twombly, 550 U.S. at 556.

## 2. Analysis

The crux of Old National's argument, once again, is that the purported contract fails under the statute of frauds because of the lack of a valid signature. The motion to dismiss, therefore, challenges the sufficiency of the following allegations in the complaint:

> 59. Mills then electronically signed the Agreement Email on the Bank's behalf when he sent Halabu his 2/4 response email from his Old National email address and affixed his signature block at the bottom.
>
> 60. The Agreement Email, and Mill's 2/4 response email, together created a signed writing evidencing the parties' agreement.
>
> 61.The language of Mills' response email further evinced and confirmed Old National's acceptance of, assent to, and intent to be bound by the agreement's terms as stated in the Agreement Email.

FAC ¶¶ 59-61.

Once again, Old National argues both that it did not agree to conduct business electronically and, essentially, that Mills did not manifest assent to the contract or an intent to adopt a memorandum of the contract by sending the 2/4/2020 9:21 a.m. email. Success on either of these arguments would render the contract void under the statute of frauds. However, neither argument warrants dismissal at the pleading stage.

### a. Halabu Holdings has sufficiently alleged that Old National agreed to use electronic signatures.

Old National's primary focus is on "MUETA's distinct gateway provision;" that is, whether the parties agreed to use electronic signatures. TRO/PI Reply at 1. However, as the statute states, "[w]hether the parties agree to conduct a transaction by electronic means is determined from the context and surrounding circumstances, including the parties' conduct." Mich. Comp. Laws § 450.835. In other words, the question of whether the parties agreed to use electronic signatures is fact bound and not easily resolved on a motion to dismiss. And as discussed at greater length above, numerous courts have found valid electronic signatures in emails, even where the signature process was not particularly robust. See supra n.14.

Against this standard, Halabu Holdings' allegations in paragraphs fifty-nine through sixty-one of the complaint are sufficient to support its claim that Old National agreed to use an electronic signature when Mills signed the email with an intent to be bound to the contract.

### b. Halabu Holdings has sufficiently alleged that the purported contract is supported by a valid signed writing.

Old National argues that "even if Plaintiff had somehow alleged that the MUETA's threshold applicability question were satisfied by the deficient FAC, Plaintiff has made no attempt to allege that ONB's purported signature in Exhibit 7 constituted a legally binding signature." MTD at 12.

Old National presents some caselaw supporting the claim that an electronic signature must be typed rather than automatically generated in the manner of a signature box. See Cunningham v. Zurich American Ins. Co., 352 S.W.3d 519, 530 (Tex. App. 2011) ("We decline to hold that the mere sending of . . . an email containing a signature block satisfies the signature requirement when no evidence suggests that the information was typed purposefully rather than generated

automatically . . . ."); <u>Forcelli v. Gelco Corp.</u>, 109 A.D.3d 244, 251 (N.Y. App. Div. 2013) (finding that a purposefully typed name constituted a signature, as distinguished from a "a situation where the sender's email software has been programmed to automatically generate the name of the email sender, along with other identifying information, every time an email message is sent.").

But these cases are not fully satisfactory.  First, they are not binding interpretations of Michigan law.  Second, they do not squarely hold that automatically generated signatures boxes are categorically insufficient to constitute a signed writing under a state's respective statute of frauds.  The <u>Cunningham</u> court considered a variety of other factors in determining that the email in question did not contain a valid signature, 352 S.W.3d at 530, and <u>Forcelli</u> only mentioned an automatically generated signature as a means of contrasting the facts before it.  Third, Halabu Holdings has presented cases suggesting a signature block, or a similarly automatically generated name, may constitute a signature for statute of frauds purposes.  <u>See, e.g.</u>, <u>Gillis</u>, 875 F. Supp. 2d at 733-735; <u>Int'l Casings Grp., Inc. v. Premium Standard Farms, Inc.</u>, 358 F. Supp. 2d 863, 873 (W.D. Mo. 2005), <u>amended</u>, No. 04-1081-CV-W-NKL, 2005 WL 8159075 (W.D. Mo. Apr. 14, 2005); <u>Cloud Corp. v. Hasbro Inc.</u>, 314 F.3d 289, 295-96 (7th Cir. 2002); <u>Lamle v. Mattel, Inc.</u>, 394 F.3d 1355, 1362 (Fed. Cir. 2005).  Fourth, the definition of "electronic signature" is broad in its formal requirements: "an electronic sound, symbol, or process attached to or logically associated with a record and executed or adopted by a person with the intent to sign the record." Mich. Comp. Laws. § 450.832(h).  The Court is unpersuaded that a signature block may not, under any circumstances, fit this definition.  Insofar as Old National argues that the purported signature is invalid simply because it was automatically generated and not typed by Mills himself, that argument is rejected.

Concerning intent, Halabu Holding's allegation that Mills manifested an intent to be bound by the written memorandum is not implausible, because Halabu Holdings has alleged that the offer and acceptance occurred on 1/31/2020, the 1/31/2020 email presented itself as a "recap" of a completed deal, and it is plausible to interpret the 2/4/2020 9:21 a.m. email as agreeing that the 1/31/2020 email accurately summarized the terms of the agreement.

Because Halabu Holdings' complaint sufficiently alleges facts that could form the basis for relief under Michigan contract law, Old National's motion to dismiss is denied.

### III.    CONCLUSION

For the reasons stated above, Old National's motion to dismiss (Dkt. 10) and Halabu Holdings' motion for temporary restraining order and preliminary injunction (Dkt. 16) are both denied.  The orders restraining Old National from selling, mortgaging, or otherwise encumbering or alienating the Property (Dkts. 17, 23) are dissolved.

SO ORDERED

Dated:  October 28, 2020                              s/Mark A. Goldsmith
      Detroit, Michigan                              MARK A. GOLDSMITH
                                  United States District Judge